UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **SENECA-CAYUGA TRIBE OF OKLAHOMA** ) | |
| and **SENECA-CAYUGA TRIBAL TOBACCO** ) | |
| **CORPORATION,** a tribal corporation, ) | |
| f/d/b/a **SENECA-CAYUGA TOBACCO** ) | |
| **COMPANY,** an unincorporated enterprise ) | |
| of the Seneca-Cayuga Tribe of Oklahoma, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 06-CV-0394-CVE-SAJ |
| ) | |
| **DREW EDMONDSON** as Attorney General ) | |
| of the State of Oklahoma, and **BANK OF** ) | |
| **OKLAHOMA, N.A.,** as escrow agent, ) | |
| ) | |
| **Defendants.** ) | |

**OPINION AND ORDER**

Now before the Court are plaintiffs' motion for preliminary injunction (Dkt. # 4) and the motion to dismiss (Dkt. # 19) filed by defendant Drew Edmondson, Attorney General ("AG") of the State of Oklahoma. Plaintiffs filed their Amended Complaint on August 8, 2006 alleging that, by virtue of their tribal sovereign immunity, defendant AG cannot legally apply to them or enforce against them OKLA. STAT. tit. 37, § 600.22 et seq. or OKLA. STAT. tit. 68, § 360.1 et seq. Dkt. # 29. The AG argues that the Court lacks subject matter jurisdiction because (1) plaintiffs do not have standing to sue; and (2) he is entitled to immunity.

**I.**

This case arises out of a dispute between the Seneca-Cayuga Tribe of Oklahoma ("Tribe") and the State of Oklahoma regarding state economic regulation of tobacco. In 1998, multiple states entered into a Master Settlement Agreement ("MSA") with various tobacco manufacturers. As one

of those states, Oklahoma passed qualifying statutes to supplement the MSA and regulate Non-Participating Manufacturers ("NPMs"). Oklahoma's qualifying statutes include the Escrow Statute, OKLA. STAT. tit. 37, § 600.21 et seq., and the Master Settlement Agreement Complementary Act ("MSACA"), OKLA. STAT. tit. 68, § 360.1, et seq. (collectively "Qualifying Statutes"). The Qualifying Statutes require that NPMs deposit funds in a qualified escrow account. OKLA. STAT. tit. 37, § 600.23. The amount each NPM must deposit depends on the units of tobacco products sold by the NPM. The escrow funds are held by a federally or state-chartered financial institution[1] and are released under three circumstances. First, the funds are released to pay a judgment or settlement on any released claim brought against tobacco product manufacturer by the state or any releasing party located in the state. OKLA. STAT. tit. 37, § 600.23(B)(1). Second, funds are released to the extend that the amount the NMP was required to place into the escrow account was greater than that required by the MSA. OKLA. STAT. tit. 37, § 600.23(B)(2). Third, to the extent funds are not released pursuant to the above two circumstances, the funds are released and reverted back to the manufacturer twenty-five (25) years after the date on which they were placed into escrow. OKLA. STAT. tit. 37, § 600.23(B)(3).

Under the MSACA, every tobacco product manufacturer must certify its compliance with the Escrow Statute. OKLA. STAT. tit. 27, § 360.4. Each manufacturer must "execute and deliver on a form or in the manner prescribed by the Attorney General a certification to the Oklahoma Tax Commission and Attorney General, no later than April 30 of each year, certifying under penalty of perjury that, as of the date of certification, the tobacco product manufacturer either: (a) is a participating manufacturer, or (b) is in full compliance with the provisions of Sections 600.21

---

[1]   In Oklahoma, the qualified escrow agent is defendant Bank of Oklahoma.

2

through 600.23 of Title 37 of the Oklahoma Statutes." OKLA. STAT. tit. 27, § 360.4. NPMs must include in the certification a list of its cigarette brand families and the number of units sold for each brand family that were sold in Oklahoma during the preceding year. They must further certify that they have established and continue to maintain a qualified escrow fund and that they are in full compliance with the provisions of the Qualifying Statutes. OKLA. STAT. tit. 68, § 360.4(A)(4).

The MSACA directs the AG to publish an Oklahoma Directory of Certified Tobacco Manufacturers and Brands ("Directory") "listing all tobacco product manufacturers that have provided current and accurate certifications," as described above. OKLA. STAT. tit. 68, § 360.4(B)(1). "The Attorney General shall not include or retain in the directory the name or brand families of any nonparticipating manufacturer that has failed to provide the required certification or whose certification the Attorney General determines is not in compliance with [the MSACA]." OKLA. STAT. tit. 68, § 360.4(B)(2). According to the MSACA, "[n]either a tobacco product manufacturer nor brand family shall be included or retained in the directory if the Attorney General concludes, in the case of a [NPM] that . . . any escrow payment required pursuant to [the Escrow Statute] . . . has not been fully paid into a qualified escrow fund." OKLA. STAT. tit. 68, § 360.4(B)(3). The AG can exclude from the Directory the products of an NPM that has not provided the AG with all the information required in the certification application. OKLA. STAT. tit. 68, § 360.8(A). The 2006 Directory was published on August 1, 2006.

The MSACA further provides that it is unlawful for any person to sell, offer, or possess for sale or import for personal consumption cigarettes of a tobacco product manufacturer or brand family that is not included in the Directory. OKLA. STAT. tit. 68, § 360.4(C)(2). Any cigarettes that are sold, offered for sale, or possessed for sale, or imported for personal consumption in violation

3

of the MSACA "shall be deemed contraband pursuant to the [MSACA]" and "shall be subject to seizure and forfeiture." OKLA. STAT. tit. 68, § 360.7(B).

The AG can enforce the statute by commencing a civil action on behalf of the state against any tobacco product manufacturer that fails to place into escrow the funds required under the Escrow Statute. OKLA. STAT. tit. 37, § 600.23(E). Further, if a tobacco product manufacturer fails to pay the amount due under the Escrow Statute, the AG "may impose a civil penalty to be paid to the General Fund of the state in an amount not to exceed five percent (50%) of the amount improperly withheld from escrow per day of the violation and in a total amount not to exceed one hundred percent (100%) of the original amount improperly withheld from escrow." Id. If the violation is knowing, then the AG can impose greater civil penalties. Id.

Plaintiffs are the Tribe and the Seneca-Cayuga Tribal Tobacco Corporation ("SCTTC"). The SCTTC was incorporated under tribal ordinances on June 10, 2006. Prior to June 2006, since 1997, the Tribe operated an unincorporated tribal enterprise, known as the Seneca-Cayuga Tobacco Company ("SCTC"). The SCTC was an NPM, as is the SCTTC. By agreement, SCTTC possesses all the assets and liabilities of SCTC. Dkt. # 29, ¶ 2.

Prior to its dissolution, the SCTC notified the AG on July 29, 2005 of its objection to the payment of escrow deposits based on "well-established principles of Indian law." Dkt. # 21, Ex. 3A. It informed the AG that all escrow payments made by SCTC would be "under protest and with all rights reserved." Id. Following the July 29, 2005 letter, SCTC made some escrow payments but continued to object to such payments. See Dkt. # 21, Ex. 3B. Despite these objections, the AG requested that SCTC provide records of its 2005 cigarette sales to determine the amount SCTC allegedly owed under the Escrow Statute. On August 1, 2006, the AG informed SCTC that

4

"[b]ecause of the [SCTC's] failure to timely and fully provide its records sales in 2005, SCTC's application to have SCTC and the brands of tobacco products that it manufactures placed in the current [2006] Directory is denied." Dkt. # 21, Ex. 1.

## II.

Federal courts are courts of limited jurisdiction and, as the party seeking to invoke federal jurisdiction, plaintiffs bear the burden of proving such jurisdiction is proper. See Southway v. Central Bank of Nigeria, 328 F.3d 1267, 1274 (10th Cir. 2003). A court lacking jurisdiction "cannot render judgment but must dismiss the case at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974). Motions to dismiss under Fed. R. Civ. P. 12(b)(1) "generally take one of two forms. The moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell, 363 F.3d 1072, 1074 (10th Cir. 2004) (internal citation and quotations omitted).

In analyzing a motion to dismiss on the basis of a facial attack on the sufficiency of the complaint, the Court must presume all of the allegations contained in the complaint to be true. Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002). However, in the case of a factual challenge under Rule 12(b)(1), the Court does not presume the truthfulness of the factual allegations of the complaint but "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." Stuart v. Colorado Interstate Gas Co., 271 F.3d 1221, 1225 (10th Cir. 2001) (citing Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)); see

also Paper, Allied-Industrial, Chemical and Energy Workers' Int'l Union v. Continental Carbon Co., 428 F.3d 1285, 1292 (10th Cir. 2005). In the case of a factual challenge, "[a] court is required to convert a 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case." Holt, 46 F.3d at 1003; see also Continental Carbon Co., 428 F.3d at 1292. "[T]he underlying issue [in determining whether the jurisdictional question is intertwined with the merits] is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." Pringle v. United States, 208 F.3d 1220, 1223 (10th Cir. 2000).

Here, defendant AG's motion to dismiss is a factual attack. He challenges the facts upon which the Court's subject matter jurisdiction depends. Thus, the Court will consider some evidence outside of the first amended complaint itself. However, the Court need not convert this motion into a motion for summary judgment because the jurisdictional question is not intertwined with the merits. The resolution of the jurisdictional question does not require resolution of any aspect of the substantive claim.

### III.

Article III restricts federal courts to the adjudication of "cases or controversies." U.S. CONST. art. III, § 2, cl. 1. "The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate." Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004); see also Allen v. Wright, 468 U.S. 737, 750-51 (1984). To establish Article III standing, plaintiffs must establish that (1) they have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action

of defendants; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. Tandy, 380 F.3d at 1283; Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000). The party seeking to invoke federal jurisdiction bears the burden of establishing all three elements of standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). If any one of these three elements — injury, causation, and redressability – is absent, then plaintiffs have no standing under Article III to assert their claim. Article III standing is determined as of time at which the plaintiffs' complaint was filed. Nova Health Systems v. Gandy, 416 F.3d 1149, 1155 (10th Cir. 2005). Thus, the Court must determine whether, as of July 31, 2006, plaintiffs faced a concrete and actual or imminent injury in fact that was caused by the defendants and that is redressable by a favorable judicial order.

Here, the AG claims that plaintiffs have not suffered an injury in fact because the AG has not enforced the Escrow Statute with respect to the named plaintiffs. The Tenth Circuit has recently held that the mere presence of a statute on the books, "in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue." Winsness v. Yokum, 433 F.3d 727, 732 (10th Cir. 2006). Here, the AG has not acted under the enforcement provisions of the Escrow Statute. Specifically, the AG has not brought a civil action on behalf of the state against plaintiffs, and he has not imposed any civil penalties based on amounts withheld from the escrow funds. See OKLA. STAT. tit. 37, § 600.23(E). The AG claims that, absent such enforcement, plaintiffs have not suffered an injury in fact. Dkt. # 19, at 9.

Plaintiffs do not deny that the AG has neither brought a civil action nor imposed a civil penalty; however they claim to have standing based on the AG's removal of SCTC from the 2006 Directory. In its first amended complaint, filed after defendant's motion to dismiss, plaintiffs allege

that "Defendant threatened to prohibit, outlaw and/or prevent sales of Plaintiff's tobacco products in Oklahoma by removing the Tobacco Company [i.e., SCTC] from its Directory of compliant tobacco manufacturers, unless the Tobacco Company (now the Tribal Corporation [i.e., SCTTC]) paid more than $8 million into the Escrow Account by August 1, 2006, and/or otherwise complied with the certification and escrow requirements of the Qualifying Statutes." Dkt. # 29, ¶ 38. However, the AG argues that its action with respect to SCTC is not sufficient to establish plaintiffs' standing because SCTTC did not file an application to be included in the 2006 Directory and SCTC no longer exists.

As noted above, the SCTC filed an application, under objection, to be included on the 2006 Directory. The AG denied that application on August 1, 2006. Thus, there is no question that the AG took enforcement action with respect to SCTC. Indeed, if SCTC still existed, then there is little question that it would have standing to bring this suit.[2] However, on June 10, 2006, SCTC ceased to exist. On that date, the Tribe incorporated SCTTC under its tribal ordinances. It is undisputed that SCTTC never filed a formal application to be included on the 2006 Directory. In fact, the AG was not notified of SCTTC's existence until August 1, 2006 – the date that the 2006 Directory was published – when SCTTC sent a letter requesting inclusion in the Directory. See Dkt. # 36, Ex. A,

---

[2] The defendant AG argues that it did not take any enforcement action, even with respect to SCTC. It argues that SCTC was never included on the 2006 Directory; thus, it was never "removed" from the 2006 Directory. According to the AG, "it is axiomatic that a tobacco product manufacturer, such as SCTC, cannot be removed from a list on which it was never included." Dkt. # 19, at 8. The Court finds this argument unpersuasive. Given that SCTC applied for inclusion on the 2006 Directory and voiced its objection to payment into the escrow fund, the AG's decision to exclude SCTC from the 2006 Directory certainly constitutes enforcement of the Escrow Statute. Indeed, the fact that the AG based its rationale for exclusion on the fact that SCTC did not submit full records does not mean that the SCTC was solely responsible and that the AG was uninvolved in the alleged injury caused by such exclusion.

Declaration of Gary Toland.[3]  It is illogical to assert that the SCTTC suffered an injury in fact based on the AG's failure to include it in the Directory when the SCTTC never filed an application seeking inclusion in the Directory and did not even notify the AG of its existence until immediately prior to the Directory's publication.

Plaintiffs incorrectly argue that they cannot be required to file a Directory application because they are challenging the constitutionality of the Escrow Statute, which requires the application.  Plaintiffs misunderstand the AG's position and the Court's ruling concerning the Directory application and standing.  In holding that the plaintiffs do not have standing because they have not applied for inclusion in the Directory or otherwise been subject to enforcement action, the Court is not ruling upon the constitutionality of the Escrow Statutes nor is it implying that SCTTC must make payments to the escrow fund.  If the SCTTC had submitted an application for inclusion in the Directory and had noted its non-compliance with the Escrow Statute based on its asserted tribal sovereignty, and the AG had rejected its application based on that non-compliance, then the SCTTC would have standing to bring this suit.  But absent an application to be included in the

---

[3]  Quite clearly, the AG could not have complied with this eleventh hour informal request; thus, this letter is not sufficient to establish that plaintiffs have suffered an injury in fact caused by defendants.

Directory, plaintiffs cannot plausibly argue that the AG's failure to include them caused plaintiffs any harm.[4]

The SCTTC cannot allege an injury based on the AG's failure to include SCTC – a different entity – from the 2006 Directory. According to the United States Supreme Court, the extent to which a plaintiff can establish standing "depends considerably upon whether the plaintiff is <u>himself</u> an object of the action (or foregone action) at issue." Lujan, 504 U.S. at 561 (emphasis added). If plaintiffs themselves were the object of action or inaction "there is ordinarily little question that the action or inaction has caused [them] injury, and that a judgment preventing or requiring the action will redress it." Id. at 562. "When, however, . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of <u>someone</u> <u>else</u>, much more is needed." Id. (emphasis in original). Here, the alleged action concerns not plaintiffs, but "someone else." Even though the AG affirmatively excluded SCTC from the Directory, the SCTC is not a party to this action; it no longer exists as an entity.

---

[4] To further explain this point, it is useful to discuss plaintiffs' analogy set forth in their supplemental response. Plaintiffs draw an analogy to a hypothetical law providing that only white males could be street vendors outside public sporting events and requiring each applicant to submit certification to the AG demonstrating his race and gender as a condition of obtaining a street vendor's license. Plaintiffs argue, "under Defendant's theory of standing, no minority or female applicant could challenge the law because he or she could not certify that the applicant is a white male in order to obtain the necessary license." Dkt. # 36, at 15. However, once a female street vendor applied for a permit and was denied the permit based on her gender, then she would have standing to challenge the constitutionality of the hypothetical statute. Likewise, in this case, the Court does not hold that, for SCTTC to have standing, it must make payments into the escrow fund or adhere to the requirements set forth in the Escrow Statute. Nonetheless, absent an application to be included in the Directory, SCTTC cannot allege that the AG caused any harm resulting from exclusion from the Directory.

Here, there is no evidence that SCTTC is in fact the same entity as SCTC with a different name. In fact, SCTTC is certainly distinct from SCTC since SCTTC was incorporated pursuant to tribal ordinances, whereas SCTC was an unincorporated enterprise. An unincorporated enterprise has no separate existence apart from that of the individual members of the enterprise. 2 FLETCHER CYC. CORPORATIONS § 17 ("Unincorporated associations are not recognized as entities at law, and have no existence separate and apart from that of their individual members."). By contrast, a corporation is a distinct entity with rights distinct from that of its members. 2 FLETCHER CYC. CORPORATIONS § 25 ("It is generally accepted that the corporation is an entity distinct from the shareholders or members and with rights and liabilities not the same as their individually and severally."). Here, SCTC, an unincorporated enterprise, had no separate existence from the Tribe. Once the Tribe incorporated SCTTC under its tribal ordinances, SCTTC became a legal entity distinct from the Tribe. As a distinct legal entity, SCTTC cannot simply rely on its relationship with the Tribe or even SCTC to establish standing. The fact that SCTTC now sells the same tobacco products that were once sold by SCTC does not change the Court's analysis. Plaintiff's first amended complaint merely notes that "[b]y agreement, the Tribal Corporation [i.e., SCTTC] now possesses all the assets and liabilities of the Tobacco Company [i.e., SCTC]." Dkt. # 29, ¶ 2. "A transaction involving a transfer of the property . . . from one corporation to another without consolidation or merger does not include a transfer of all the powers or immunities of the selling corporation." 15 FLETCHER CYC. CORP. § 7085. Thus, the acquisition of SCTC's assets by SCTTC does not establish standing.

Finally, the Court notes that the mere fact that the AG removed SCTC from the Directory does not mean that there is a credible threat of enforcement with respect to SCTTC. Since SCTTC

11

has not yet suffered an injury in fact caused by defendants, plaintiffs must show a real and immediate threat of being injured in the future. City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 107 n.8 (1983). While "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," O'Shea v. Littleton, 414 U.S. 488, 496 (1974), the fact of past injury does not confer standing to seek prospective injunctive relief without some credible threat of future injury. Lyons, 461 U.S. at 108; Winsness, 433 F.3d at 735. This is particularly true where the past alleged wrong involved SCTC, not SCTTC. SCTTC cannot state with reasonable certainty that the AG will deny SCTTC's application for inclusion on the next Directory. Until that time or until the AG otherwise enforces the Escrow Statutes with respect to SCTTC, SCTTC cannot be said to face an imminent harm. The potential exclusion from the Directory in the future is, at this point, too conjectural to constitute an injury in fact.

In sum, plaintiffs have failed to meet their burden of establishing standing to bring this suit. While the AG took specific action with respect to SCTC in enforcing the Escrow Statute, SCTC no longer exists as an entity. The Tribe alleges no injury apart from its affiliation with SCTC or SCTTC. SCTTC, the other plaintiff in this case, never filed a formal application to be included in the Directory. Thus, plaintiffs cannot assert that the AG's failure to include SCTTC on the Directory caused plaintiffs an injury in fact. Since the AG is not otherwise enforcing the Escrow Statute by initiating a civil suit or filing civil fines, plaintiffs do not have standing to bring this suit at this time. Given that plaintiffs do not have standing to bring this suit, the Court need not address the issue of sovereign immunity. Further, plaintiffs' motion for preliminary injunction is moot.

**IT IS THEREFORE ORDERED** that the motion to dismiss (Dkt. # 19) filed by defendant Drew Edmondson, Attorney General of the State of Oklahoma is **granted**. Plaintiffs' motion for preliminary injunction (Dkt. # 4) is **moot**. This is a final order terminating this action.

**DATED** this 29th day of November, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT